JOINT APPRENTICESHIP AND TRAINING COMMITTEE OF SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL NO. 9, a Trust; William Stephens and Don Lawson, two of the present Trustees of the Joint Apprenticeship and Training Committee

of Sheet Metal Workers' International Association, Local No. 9; National Training Fund for the Sheet Metal and Air Conditioning Industry, a Trust; and James E. Roth and Edward J. Carlough, two of the present Trustees of the National Training Fund, Plaintiffs,

v.

Glenn E. CHAPMAN, Peter V. Germann, William Craig Peterson, Jr., Kirk Harris, Edward Alan Thomas, David E. Boehm, James H. Lee, David J. Cuthbertson, Matthew J. Babcock and James R. Pech, Defendants.

JOINT APPRENTICESHIP AND TRAINING COMMITTEE OF SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL NO. 9, a Trust; William Stephens and Don Lawson, two of the present Trustees of the Joint Apprenticeship and Training Committee of Sheet Metal Workers' International Association, Local No. 9; National Training Fund for the Sheet Metal and Air Conditioning Industry, a Trust; and James E. Roth and Edward J. Carlough, two of the present Trustees of the National Training Fund, Plaintiffs,

v.

Donald M. FLANSBURG, Defendant.

Nos. 87–DC–1352, 88–DC–1189.

United States District Court,
D. Colorado.

April 26, 1990.

Dennis Valentine, Brauer, Buescher, Valentine, Goldhammer & Kelman, Denver,

Colo., and William Klenert Ecklund, Felhaber, Larson, Fenlon & Vogt, Paulette Kane Flynn, St. Paul, Minn., for plaintiffs.

Robert R. Miller, Stettner, Miller and Cohn, Denver, Colo., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

H. DALE COOK, Chief Judge, Sitting by Designation.

This matter came on for nonjury trial on December 6, 7, 8, 11, 12, 13 and 14, 1989. Plaintiffs bring this action against the defendants for alleged breach of contract.

In support of their claim, plaintiffs state that they are multi-employer apprenticeship training funds. As training funds, plaintiff Joint Apprenticeship and Training Committee of Sheet Metal Workers International Association, Local 9 (Local JATC) and plaintiff National Training Fund for the Sheet Metal and Air Conditioning Industry (NTF) (collectively, "the Trust Funds") established a scholarship loan training program (training program). The eleven defendants are all sheet metal workers who signed, collectively, twenty-seven agreements. Six of these agreements originated in September, 1981 and are referred to as Supplement to Apprenticeship Agreements (Supplement Agreements). Twenty-one of these agreements originated in September, 1984 and are referred to as Scholarship Loan Agreements (SLA). The Supplement Agreement and the SLA collectively are referred to as "the Agreements". Plaintiffs allege that as part of the training program, each defendant was required to sign either a Supplement Agreement or a SLA promising to repay stated training costs either by repayment in cash plus interest or by in-kind credit earned by working for an employer which was signatory to a collective bargaining agreement providing for payment of contributions by the employer to NTF and Local JATC. Plaintiffs allege that each of the defendants signed the Agreement(s), received training and are in breach of the Agreement(s) by either having failed to repay the stated training costs in cash, plus interest, or having sought or accepted employment with an employer in the sheet metal industry which was not signatory to a collective bargaining agreement providing for contributions to NTF and Local JATC. NTF and Local JATC seek judgment against each defendant for the alleged unpaid balance of the scholarship loans, interest, attorney fees, costs and the return of all training material prepared by NTF allegedly in the possession of the defendants.

In response to these allegations, defendants Glenn Chapman, Peter Germann, William Peterson, Jr., Kirk Harris, Edward Thomas, David Boehm, James Lee, David Cuthbertson, Matthew Babcock, James Pech and Donald Mark Flansburg deny both the validity and enforceability of the Agreements.

Specifically defendants assert that the Agreements were invalid under the Declarations of Trust[1], the Apprenticeship Agreements[2], and ERISA[3]. Additionally, the defendants contend that the Agreements were unenforceable for lack of consideration, duress and coercion. Alternatively, defendants assert that under the language of the Agreements, certain defendants did not commit any act which would constitute a breach of the terms of the Agreements.

The parties have stipulated to the following facts:

1. *Matthew J. Babcock* signed a SLA and Promissory Note on September 18, 1984 and on January 10, 1985. On January 25, 1988, Babcock went to work for Willner Industries at a time when Willner Industries was not making contributions, and Babcock knew Willner Industries was not making contributions, on Babcock's work to Local JATC and NTF.

---

1. The governing documents of the Trust Funds.

2. Agreements required to be signed by each apprentice prior to being referred out for work in the industry.

3. Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. § 1001 *et seq.*

2. *David E. Boehm* signed a SLA on September 8, 1986.

3. *Glenn E. Chapman* signed a SLA on September 8, 1986 and another SLA on January 12, 1987. On July 8, 1987 Chapman went to work for Concord Sheet Metal, an employer in the sheet metal industry which was not signatory to a collective bargaining agreement providing for contribution to Local JATC and NTF.

4. *David J. Cuthbertson* signed a Supplement Agreement on September 14, 1981, a SLA and a Promissory Note on September 11, 1984, a SLA on September 13, 1984 and a Promissory Note on September 20, 1984. Cuthbertson went to work in August, 1987 for Action Air, an employer in the sheet metal industry, at a time when Action Air was not making contributions, and Cuthbertson knew Action Air was not making contributions, on Cuthbertson's work to Local JATC and NTF.

5. *Donald Mark Flansburg* signed a SLA on September 10, 1984 and a Promissory Note on September 11, 1984. Flansburg went to work in May, 1988 for Pasterkamp Heating, an employer in the sheet metal industry, at a time when Pasterkamp was not making contributions, and Flansburg knew Pasterkamp was not making contributions, on Flansburg's work to Local JATC and NTF.

6. *Peter v. Germann* signed a Supplement Agreement on September 13, 1982, a SLA and Promissory Note on September 12, 1984 and a SLA on September 12, 1985.

7. *Kirk Harris* signed a Supplement Agreement on September 13, 1982, a SLA and Promissory Note on September 12, 1984, and two separate SLA's on September 12, 1985.

8. *James H. Lee* signed a Supplement Agreement on September 14, 1981, a SLA and Promissory Note on September 13, 1984 and a SLA and Promissory Note on January 15, 1984. Lee went to work on July 7, 1987 for Action Air, an employer in the sheet metal industry, at a time when Action Air was not making contributions, and Lee knew that Action Air was not making contributions, on Lee's work to Local JATC and NTF.

9. *James R. Pech* signed a SLA and a Promissory Note on January 8, 1986 and a SLA and Promissory Note on January 9, 1986.

10. *William Craig Peterson, Jr.* signed a Supplement Agreement on September 14, 1981, a SLA and Promissory Note on September 13, 1984, and a SLA and Promissory Note on September 11, 1984.

11. *Edward Alan Thomas* signed a Supplement Agreement on September 14, 1981, a SLA and a Promissory Note on September 13, 1984, and a SLA and Promissory Note on September 11, 1984. Thomas went to work for Climax Sheet Metal on July 10, 1987, at a time when Climax was not making contributions, and Thomas knew Climax was not making contributions, on Thomas' work to Local JATC and NTF.

The parties have submitted both pre- and post-trial briefs, and the matter is now ready for disposition on the merits. After considering the pleadings, testimony, exhibits admitted at trial, the briefs and arguments presented by counsel, applicable case law and statutory authority, and being fully advised in the premises, the Court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Cv.P.

## FINDINGS OF FACT

*Parties and Jurisdiction*

1. Plaintiff Joint Apprenticeship and Training Committee of Sheet Metal Workers' Local Union No. 9 is a multi-employer apprenticeship training fund.

2. Plaintiff National Training Fund for the Sheet Metal Industry is a multi-employer apprenticeship training fund.

3. James E. Roth and Edward J. Carlough are current Trustees of the NTF and are fiduciaries. William Stephens and Don Lawson are current Trustees of Local JATC and are fiduciaries.

4. Defendants Glenn E. Chapman, Peter V. Germann, William Craig Peterson, Jr., Kirk Harris, Edward Alan Thomas, David

E. Boehm, James H. Lee, David J. Cuthbertson, Matthew J. Babcock, James R. Pech and Donald Mark Flansburg are participants and beneficiaries of the JATC and NTF.

5. The Court has jurisdiction over the subject matter arising under the provisions of ERISA.

6. Venue is proper within the District Court of Colorado in that this is the district where the training program was administered and where the alleged breach took place.

*Background of the Training Funds and Program*

7. On July 6, 1962, Local Union 9 of the Sheet Metal Workers International (the Local Union) entered into an Agreement and Declaration of Trust (Local Trust Agreement) with the Denver based sheet metal contractors who were signatories to a collective bargaining agreement (Employers).

8. The purpose of the Local Trust Agreement was to provide financial aid for the training of apprentices and journeymen of the Local Union.

9. The Local Union and the Employers each have three representatives or Trustees on the Local JATC which administers the Local Trust Agreement.

10. The Local Trust Agreement provided for the creation of a trust fund to train apprentices and journeymen.

11. The Local Trust Agreement provides that funding of the Trust Fund would be by contributions from Employers, income and receipts derived from investments, and any other money or properties received and held by the Trustees.

12. Contributions are set by the collective bargaining agreement which requires a contribution based upon hours worked by sheet metal workers who are members of the Local Union.

13. The Sheet Metal Workers International Association (the International Union) and Sheet Metal and Air Conditioning Contractors National Association (SMACNA)[4] entered into an Agreement and Declaration of Trust[5] (National Trust Agreement) dated May 12, 1971 for the establishment of a National Trust Fund for the Sheet Metal and Air Conditioning Industry.

14. The International Union and SMACNA each have three representatives or Trustees on the NTF which administer the National Trust Agreement.

15. Funding for the trust created by the National Trust Agreement would be provided from the collective bargaining agreement entered into by the local unions and local employers who were signatories to a collective bargaining agreement. Under the National Trust Agreement, as under the Local Trust Agreement, the trust fund was to be funded by contributions based upon hours worked by sheet metal workers who were members of the local unions throughout the United States. The amount per hour is set by the collective bargaining agreements.

16. The National Trust Agreement contains the following definitions under Section 1:

*Employers:* means an employer who has executed a collective bargaining agreement providing for payments to the NTF.

*Contributions:* means payments by the Employers to the NTF pursuant to the collective bargaining agreements.

*Named Fiduciaries:* The Board of Trustees as defined in Article III of the Trust Agreement shall constitute all of the named fiduciaries of this trust, and jointly shall have authority to control and manage operation and administration of the NTF.

*Local Union:* shall mean any affiliate of the International Union which now or hereafter has a collective bargaining agreement with an Employer requiring payments to be made to the NTF.

---

**4.** Sheet Metal and Air Conditioning Contractors National Association is a national contractors' trade association engaged in education, lobbying and labor relations.

**5.** This was a "restated" agreement which incorporated amendments to prior agreements.

*Union Trustees:* means those trustees appointed by the International Union pursuant to the Trust Agreement.

*Fiduciary:* includes,

The Board of Trustees

The Administrator of the NTF

Persons delegated authority to carry out the Trust Agreement

Any trust company designated as a corporate agent

17. The declared "establishment, aim and purpose" of the National Trust Agreement is set forth in Section 2:

(a) To develop comprehensive training programs for journeymen, apprentices and other members of local unions on whose behalf contributions are made into the Fund and through training to upgrade the general quality of workmanship and productivity.

(b) To investigate, research, and monitor changing technology to anticipate and implement training needs.

(c) To provide training for new specialty fields engendered by changing technology, to provide training in the use of new materials and new methods and to establish skill and proficiency in the Sheet Metal Industry and other related fields to which the skills of journeymen sheet metal workers may be adapted.

(d) To conduct manpower surveys and to promote training of qualified individuals through established training programs to alleviate shortages of manpower wherever such shortages are found to exist, to prepare, publish and distribute recruitment materials, and to employ professional consultants to accomplish these purposes.

(e) To provide assistance to local training programs to upgrade the training and quality of workmanship.

(f) No part of the NTF shall be expended in any way for political purposes.

(g) To publicize by appropriate methods the work which is being done by the NTF.

(h) To act as a collecting agent for other jointly administered trust funds providing benefits for the training of sheet metal workers in the sheet metal industry where the collective bargaining agreement provides that the NTF shall act as such collecting agent.

18. Section 4 of the National Trust Agreement lists that one of the powers and duties of Trustees is to receive all contributions paid to the NTF by the Employers. All contributions so received, together with any income therefrom, shall be held, managed, and administered in trust pursuant to the terms of the Trust Agreement.

19. Under Section 4, the Trustees are empowered to make the following disbursements:

(a) To pay or provide for the payment of all reasonable and necessary expenses of collecting the Employer contributions and administering the affairs of this Trust, the employment of such employees, legal, expert, and clerical assistance, the leasing or purchasing of such premises and the purchase or leasing of such materials, supplies, and equipment as the Trustees in their discretion find necessary or appropriate in the performance of their duties. The Trustees are authorized and empowered to hire an administrator and a field staff and to delegate to them such duties as the Trustees deem appropriate.

(b) To pay all or any part of the cost of approved programs in furtherance of the purposes of the Trust.

(c) To establish and accumulate such reserve funds as the Trustees in their discretion deem necessary or desirable for proper execution of the Trust.

(d) To make grants or loans to local joint apprenticeship training programs, educational institutions, research organizations, and professional consultants to carry out the purposes and objects of the NTF.

20. The "fiduciary duties" of Trustees are defined in Section 4.10 of the National Trust Agreement.

Each Trustee herein shall discharge his duty with respect to the NTF solely in the interest of the participants of the trust funds and for the exclusive purpose of:

(a) Defraying the reasonable expenses of administering the trust fund; and (b) Accomplishing the aims and purposes [of the Trust Agreement].

21. Section 5 of the National Trust Agreement contains the "basis" of contributions:

Payments required to be made under the collective bargaining agreement shall be made pursuant to the terms of such agreement. All payments shall be paid to the Trustees at such time as the Trustees direct.

22. The Local JATC and the NTF were established to be affiliated but separate entities which were to be governed by their own respective Trustees.

*The Supplement Agreement*

23. The Supplement Agreement was introduced to apprentices beginning with the 1980 apprenticeship class. Prior to this time there had been no similar agreement since the JATC program was established in 1962.

24. On May 5, 1980 the General President of the International Union, Edward Carlough, sent a letter to all business managers of the local unions. The letter transmitted an enclosure entitled "Supplement to Apprenticeship Agreement Between Apprentice and Joint Apprenticeship Committee", and directed the local unions to use it in their training program. The letter provided:

A number of local unions have expressed concern over the fact that some apprentices and journeymen utilize the skills that they have learned in our local union apprenticeship training and journeymen skill improvement programs in the non-union market. This concern is a serious one because it represents the subsidization of non-union competition with monies from our joint union/management training trust funds.

A special committee of the General Executive Council, chaired by General Secretary–Treasurer Turner, studied this program and consulted with legal counsel concerning possible solutions. As a result of those efforts, we enclose two agreements to be used as general guidelines—one to cover apprentices and the other to cover journeymen. These agreements generally provide that apprentices or journeymen will not work non-union for a designated period of time after they receive training financed in part by a Joint Apprenticeship Committee.

25. The Supplement Agreement was designed to be a two-party instrument between the Local Union and the apprentice or journeyman.

26. On August 5, 1980 the Local JATC unanimously voted to adopt a supplement to the apprenticeship agreement

whereby the apprentice will be held financially responsible for his training cost and reimburse the training committee should he quit the program and seek employment in any phase of the sheet metal trade covered by the agreement within one year from withdrawal from the program. Also, he will reimburse the Committee for costs incurred for each month of training in excess of one year for a maximum of two years.[6]

The Local JATC also adopted a training agreement for journeymen whereby journeymen would reimburse the Local JATC for the cost of training if they accept employment with a non-contributing employer or become self-employed in the sheet metal industry within one year after completion of the training.

27. The Local JATC first used the Supplement Agreement in September 1980. It was utilized from 1980 through 1983. The Supplement Agreement was designed to be signed by an apprentice on the first night of his four-year training program to be effective for the four-year term.

28. Journeymen who elected to take an "up-grade" class during 1980 through 1983 were also required to sign a Supplement Agreement.

29. Plaintiffs contend that the sole purpose of requiring apprentices and journeymen to sign the Supplement Agreement was to replenish the monies contributed by

---

**6.** Minutes of Local JATC dated August 5, 1980.

Employers in order to train future apprentices and journeymen. However, this contention is pretextual. A significant effect of the Supplement Agreement and thus, the Court concludes, the primary purpose thereof, was to prevent union workers from going non-union. Under the terms of the Supplement Agreement, an apprentice or journeyman would only be in default and required to reimburse the Trust Funds if he went to work for a non-union sheet metal employer or became self-employed in the sheet metal industry. Therefore an apprentice could go through four years of training, at the expense of the contributing Employers and then become employed in another trade or industry (*e.g.* carpentry) without being required to reimburse the cost of his training. Additionally, an apprentice who completed the training program and thereafter worked for a union contractor in another state would not be in breach even though his training was funded through the Denver Local JATC. Also, an apprentice or journeyman who paid his union dues and stayed on the union's out-of-work list would not be in breach of the Supplement Agreement as long as he did not accept work with a non-union employer in the sheet metal industry.

30. A major consideration in adopting the Supplement Agreement was the Trustees' concern for the welfare of the contributing Employers. The Trustees thought it was unfair to the Employers to require them to pay to train sheet metal apprentices and have their training benefit non-union competitors.

31. Edward Carlough and James Roth, as co-chairmen of the NTF sent a letter to all Local JATC. The letter stated:

Since May 5, 1980 the industry has been using agreements titled "Supplement to Apprenticeship Agreement between Apprentice and Joint Apprenticeship Committee". Those agreements were designed in an effort to curtail the constant attempts at "pirating" union industry highly trained journeymen and apprentices by the common market.

\* \* \* \* \* \*

However, since the initiation of the present contracts the industry has continued to monitor and research the subject in an effort to strengthen our position. As a result we are extremely pleased to announce that the Sheet Metal Workers' International Association (SMWA) Executive Council has accomplished an unquestionable "breakthrough" by the development of a "Sheet Metal Scholarship Loan Agreement".

*The Scholarship Loan Agreement*

32. The Trustees of the NTF worked on formulating the SLA from 1977 until 1984 when it was first used.

33. The SLA was enacted during a time when the economy was good and construction work was plentiful in Denver, Colorado. There was no forecast of a downturn in the economy in 1980. In fact, the construction industry was sufficiently strong that the Local JATC and the Local Union formed a partnership which purchased an additional training facility. At the time the SLA was adopted there was no financial justification for it. The Trust Funds were solvent and there was no concern regarding Colorado apprentices receiving training and thereafter working for a non-union employer.

34. The SLA was designed to be a three-party contract among the Local JATC, the NTF and the individual apprentice or journeyman.

35. The evidence clearly established that the primary purpose in implementing the SLA was to prevent union-trained apprentices and journeymen from leaving the union and going to work for a non-union competitor. The NTF Trustees did not believe the Supplement Agreement was of sufficient deterrence to prevent non-union competitors from "pirating" union trained apprentices and journeymen; therefore, they implemented a stronger weapon: the SLA.

36. In a memorandum sent by David Turner, the General Secretary–Treasurer of the International Union, to Edward Carlough on March 17, 1980, Mr. Turner discussed the problem the union was facing

**1016**

by lost investment in training its members and subsidization of the competition. Mr. Turner compares two situations: one in which an individual terminates union work for health or personal reasons and enters an entirely different field of endeavor; and another, in which the individual terminates union work to perform his skill for a non-union employer. Mr. Turner was only concerned about the latter situation—"namely, subsidization of non-union competition".

37. On March 25, 1983 Robert Frisbee, an instructor with a Local JATC in Boise, Idaho, sent a letter to Edward Carlough expressing his concern that skilled apprentices and journeymen were leaving the union and going to work for non-union competitors. He inquired what steps were being taken to correct the situation. On April 12, 1983, Edward Carlough replied that the union was implementing a program imposing what the union believed to be the maximum legal restriction on union workers.

38. In a memorandum to all local union business managers, W. L. Fillippini, Administrator of the NTF stated, "As you are aware, the purpose of the Scholarship Loan Agreement is to discourage apprentices, who have been trained using funds contributed through a union collective bargaining agreement, from working non-union in the Sheet Metal Industry".

39. In a "news release" dated February 21, 1984 written by the International Union, the caption reads:

Sheet Metal Scholarship Loan Agreement Plan Aids Training, Sets Penalty Averaging $10,000 If Student Goes Nonunion

40. In a desire to obtain a life-time commitment by apprentices and journeymen, Edward Carlough was interested in setting the maximum restrictions possible. The various drafts of the SLA show its development. The Trustees chose in many instances to make the agreement more rather than less restrictive.

W.L. Fillippini hired the Main Hurdman accounting firm to calculate the average annual training cost per journeyman and per apprentice. On January 15, 1984 the accounting firm estimated such cost to average $255 per journeyman and $325 per apprentice. However, Edward Carlough and other Trustees of the NTF decided to increase these figures to $310 per journeyman and $390 per apprentice. Further, there was no factual basis from the evidence to conclude that the $1,000 amount labeled "intangible" costs had any rational relationship to costs not already considered in the figure determined by the NTF and the Local JATC. Mr. Fillippini testified the $1,000 "intangible" cost was added to cover hours attributed by *volunteer* time, including man-hours of Trustees, ad hoc committees developing the curriculum and the apprenticeship contests, and the time of journeymen in training apprentices on the job.

The minutes of the Board of Trustees dated January 31–February 2, 1984 show the Board was considering an "intangible" cost ranging from $500 to $1,000. Correspondence between Edward Carlough and W.L. Fillippini clearly establishes that the Chairman of the NTF favored the highest possible amount.

41. The Local JATC was not given an option to accept the SLA. Local unions were informed that the NTF would not supply any books or training materials unless all trainees and instructors were signatories to the SLA.

42. On July 1, 1987, the Local Union struck sixteen Employers which refused to sign the new collective bargaining agreement. To this date, none of these Employers has signed a collective bargaining agreement. These consolidated lawsuits were commenced in September, 1987. Prior to July 1, 1987 the Local JATC and the NTF had made no effort to enforce the Agreements in Colorado although the training program had experienced a twenty-five percent apprentice drop-out rate.

*Signing the Agreements*

43. To become an apprentice, the applicant attends an orientation meeting and is given an application form. Other materials covered at orientation include an overview of the Apprenticeship Standards (especially the disciplinary section), union dues, fringe

benefits, test materials and the interview process. There is no mention at the orientation meeting, nor in the application form, that an apprentice may be required to pay for the cost of training.

44. All applicants appear before an interview committee for an oral interview. They are also administered a written examination. Apprentices are selected based upon ratings they receive from the oral interview and written examination. No mention is made during the interview that an apprentice may be required to pay for the cost of training.

45. The apprentices are indentured, issued a hard hat and referred out for work in the industry.

46. On the first night of class, apprentices are given several documents to sign. The course syllabus attachment to the Apprenticeship Standards indicates, "Fees to be Paid: None." In the years 1980 through 1983, on the first night of the apprentices' first year, each apprentice signed a Supplement Agreement.

47. Commencing in 1984, with the introduction of the SLA second, third and fourth year apprentices were required to sign the SLA at the beginning of each year. Journeymen signed a SLA for each up-grade course they elected to take. All apprentices and journeymen were required to sign the SLA or be dismissed from the training program and terminated from employment.

48. There were several changes made in the terms of the SLA as compared to the Supplement Agreement. For instance, a ten year payback/credit period replaced the prior two-year commitment. The SLA increased the geographic scope of the employment restrictions from the State of Colorado to an area which includes the entire United States. The amount of required payback/credit was greater, a pro-rata arrangement was incorporated wherein the trainee worked out his payback/credit over a period of time, commencing with a 5% reduction in his obligation the first year up to a 15% reduction the tenth year. In other words, the Trustees added a ten-year "end-loaded" payment schedule to discourage apprentices, for as long as possible, from working non-union.

*Calculation of Trust Fund Costs and Lost Revenues*

49. The evidence established that the average training cost per apprentice recited in the SLA was $2,500 per year or $10,000 for the four year program.

50. The SLA-recited "costs" were calculated separately by the Local JATC and the NTF. Additionally, the "intangible" amount of $1,000 was added to each SLA.

51. At trial when W.L. Fillippini was questioned regarding the reasonableness of the payback/credit, he agreed that an apprentice would work an average of 2,000 hours per year. If a contribution were made on his behalf by a contributing Employer, the Employer would pay 6¢ per hour to the Local JATC and 13¢ per hour to the NTF. Therefore an Employer would pay an average of $380 per year per apprentice or $3,800 for ten years.[7] The amount an apprentice would be required to pay if he went non-union is three times the amount of lost revenues to the Trust Fund caused by an apprentice going non-union and bears no relation to the costs of the training received by the apprentice. In any event, to collect the SLA-recited "cost" would be a windfall rather than a refund or a recoupment of lost revenues to the Trust Funds.

52. When Employers make contributions to the Trust Funds, they are required to contribute an amount per hour for every hour worked by *all* their employees covered by the collective bargaining agreement, regardless of whether such employees had participated in a training program. Therefore requiring "defaulting" apprentices or journeymen to pay "actual" cost of training is not rationally related to replenishing the Trust Funds for lack of contributions on their behalves by a contributing Employer.

---

**7.** In calculating the payback amount, the Court notes that there was no evidence indicating an allowance for the contributions made by contributing Employers for the work of apprentices during the four year period of apprenticeship training.

53. Until 1987, upon "default", interest was charged to the apprentice or journeymen from the date of signing the SLA rather than from the date of "default".

54. Other efforts were made by the NTF and Local JATC to maximize cost calculations. On the local level costs for a given year were said to be calculated by taking the total training expenses from the prior year and dividing them by the number of trainees for that prior year, to arrive at a cost per trainee. However, if a program year commenced with forty trainees but concluded with only thirty, the fact that ten trainees partially completed the year was not considered.

55. For the year ending June 30, 1986, total disbursements were $183,734 *plus* a $140,810 mortgage payment for the new facility half-owned by the Local Union. The JATC included the $140,810 mortgage payment for the new facility half-owned by the Local Union.

56. For 1987, total training "cost" disbursements at the Local JATC included a $4,800 repayment to the NTF of a loan grant. However the rules set by the NTF for the Local JATC excluded loan grant repayments from permissible expense items.

57. The evidence established no rational relationship between the payback/credit recited in the SLA and either the actual cost of training or lost revenues to the Trust Funds caused by a "defaulting" apprentice or journeyman.

## CONCLUSIONS OF LAW

*Parties and Jurisdiction*

1. Plaintiffs Local JATC and NTF are multi-employer plans within the meaning of 29 U.S.C. § 1002(37)(A).

2. Plaintiffs James E. Roth and Edward J. Carlough are current Trustees of the NTF and are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

3. Plaintiffs William Stephens and Don Lawson are current Trustees of the Local JATC and are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

4. Defendants Glenn E. Chapman, Peter V. Germann, William Craig Peterson, Jr., Kirk Harris, Edward Alan Thomas, David E. Boehm, James H. Lee, David J. Cuthbertson, Matthew J. Babcock, James R. Pech and Donald Mark Flansburg are participants and beneficiaries of the JATC and NTF within the meaning of 29 U.S.C. § 1002(7) and (8).

5. The Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1).

The Court recognizes that there is a division among the circuits on the issue of whether an employee benefit fund, as an independent entity, has standing to bring an action. *See, e.g., Pressroom Unions–Printers League Income Security Fund v. Continental Assurance Co.,* 700 F.2d 889 (2nd Cir.1983) *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983); *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.,* 698 F.2d 320 (7th Cir.1983); and *Laborers Fringe Benefit Funds Detroit and Vicinity v. Northwest Concrete & Construction, Inc.,* 640 F.2d 1350 (6th Cir.1981).

The jurisdictional provisions of ERISA do not on their face authorize a pension fund to assert a cause of action. 29 U.S.C. § 1132(e)(1) gives the district courts exclusive jurisdiction of civil actions brought by a participant, beneficiary or fiduciary. Similarly, § 1132(a)(3), the Act's provision dealing with standing, states that a participant, beneficiary or fiduciary may bring an action for civil enforcement of the terms of a Trust Agreement. The confusion is centered on § 1132(d)(1) which provides that an employer benefit plan may sue or be sued as an entity.

The Court need not express an opinion on this issue since the Trustees, as fiduciaries, have standing and are properly before the Court, satisfying the jurisdictional requirements of 29 U.S.C. § 1132(e)(1).

6. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2).

*Invalidity Under the Trust Agreements*

Trustees' Actions Not Authorized

■ 7. The Supplement Agreement and SLA are invalid under the Local and Na-

tional Trust Agreements. The NTF is bound by the National Trust Agreement which states that the purpose of the Trust is to "develop comprehensive training programs for journeymen, apprentices and other members of local unions on whose behalf contributions are made ..." The Trust is empowered to disburse funds "to pay all or any part of the cost of approved programs ..." There is no authority within the National Trust Agreement to require trainees to pay for their training.

8. The Local JATC is bound by the Local Trust Agreement. The 1983 Trust Agreement declared its purpose as providing "financial aid for the training of apprentices and journeymen sheet metal workers".

9. When asked at trial what authority W.L. Fillippini was relying upon in the National Trust Agreement to require trainees to pay the cost of training, Mr. Fillippini listed three sections: Section 2.1 which states the purpose of the Trust Fund is to, *inter alia*, develop training programs for journeymen; Section 4.3 which authorizes Trustees to adopt such rules and regulations as deemed appropriate to carry out the purposes of the NTF, and Section 4.9 which allows Trustees to construe the provisions of the NTF. The Court concludes that the provisions in the National Trust Agreement which authorize the Trustees to adopt rules and regulations and construe provisions of the NTF only authorize the Trustees to implement rules and regulations consistent with the terms and purpose of the National Trust Agreement. These provisions do not allow Trustees to go outside the Agreement in implementing rules and regulations or in construing the provisions. Therefore, pursuant to the terms of the National Trust Agreement, as written, the Court concludes the Trustees were without authority to implement the Supplement Agreement and the SLA.

Breach of Fiduciary Duty under Trust Agreements

10. Under the Trust Agreements, the Trustees are fiduciaries. At trial, W.L. Fillippini testified that as Administrator of the NTF he did not consider himself to be a fiduciary. However, the National Trust Agreement lists all individuals deemed to be fiduciaries and included in the list is the Administrator of the Fund.

After being informed that he was a fiduciary, Mr. Fillippini testified that as a fiduciary he believed his responsibility was to seek collection from defaulting parties to "preserve the integrity of the fund".

Mr. Fillippini also indicated that his primary concern was to protect the interests of the contributing Employers. He testified:

Many individuals use that training, exploit the investment made in their behalf, and in turn went to work for non-sheet metal contractors. Those who had not paid one cent toward the cost of that training or started up non-union sheet metal shops of their own. The results were serious, that is, the training that NTF have given them at no cost, was being used against and at the expense of those contributing contractors who must carry the burden of higher operating costs of the training needs of the organized industry. It is a truism that contributing contractors were placed in a position of double jeopardy.

11. The Court concludes that the Administrator and Trustees of the NTC and Local JATC breached their fiduciary duties under the Trust Agreements by adopting a payback/credit plan for the primary purpose of benefiting the Union and contributing Employers. The Trust Agreements require fiduciaries to discharge their duties solely in the interest of the participants and beneficiaries of the Trust Agreements.

*Invalidity Under ERISA*

Breach of Fiduciary Duty under ERISA

12. NTF was established under the Labor Management Relations Act, 1947, § 302(c)(5), 29 U.S.C. § 186(c)(5), and jointly administered under the provisions of ERISA.

13. The Trustees, of the NTF and Local JATC, are fiduciaries as to all participants and beneficiaries of the Trust Fund. *Deak v. Masters, Mates & Pilots Pension Plan,* 821 F.2d 572 (11th Cir.1987) *cert. denied,*

484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

14. The concept of fiduciary duty in the case of employee benefit plans is described at 29 U.S.C. § 1104(a)(1), which provides, that a fiduciary is required to

discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries, and ... (D) in accordance with the documents and instruments governing the Plan. 29 U.S.C. § 1104(a)(1)(A)(i) and (D).

### Trustees Actions Were Arbitrary and Capricious

15. Judicial review of a Trustee's decisions is limited to a determination of whether the decision is arbitrary or capricious. A decision is neither arbitrary nor capricious if it is based on substantial evidence and is not the result of a mistake of law. *Sage v. Automation, Inc., Pension Plan and Trust*, 845 F.2d 885, 895 (10th Cir.1988); *Naugle v. O'Connell*, 833 F.2d 1391, 1394 (10th Cir.1987).

16. The Court finds that the Trustees' decision to implement a payback/credit plan violates federal law in that (i) the payback/credit plan is arbitrary and capricious in both its effect on the participants and in the manner it is being implemented; and (ii) it represents a breach of fiduciary duties because the payback/credit plan was not enacted for the sole benefit of the participants. More specifically, there is a lack of credible evidence showing a financial justification for the Trustees' action. The Trustees did not consider less restrictive means for accomplishing the stated purpose. There is no rational nexus between the fund's purposes and their discriminatory payback/credit requirement. There is no rational relationship between the amount of payback/credit and the actual cost of training or lost revenues to the Trust Funds.

### No Financial Need

17. Plaintiffs have failed to prove that there is a financial justification for either the Supplement Agreement or the SLA. There was no evidence that the training program was in financial jeopardy. The Funds are adequately supported by Employer contributions.

### Failure to Consider Less Restrictive Alternatives

18. Plaintiffs have added a ten-year "end-loaded" payment schedule to discourage apprentices, for as long as possible, from working non-union.

19. Plaintiffs have failed to pro-rate liability for apprentices who attended only a few classes, in order to inflate the cost calculations.

20. Plaintiffs have failed to offer an alternative repayment plan for apprentices or journeymen that receive the training and then work for a non-contributing Employer who may be willing to sign a participation agreement to repay the cost of training, in order to employ trained workers.

### Discriminates Among Participants

21. The Trustees are discriminating against apprentices and journeymen who work for non-union Employers. Plaintiffs have proven no legal bases for the discrimination. Therefore, it must be concluded that the Trustees' actions are arbitrary and capricious and are not for the sole and exclusive benefit of the apprentices but rather are for the benefit of the union and contributing Employers.

For example, payment is required of an apprentice who works in the non-union sheet metal industry even though this apprentice may have attended only a couple of classes in a single semester. Whereas, no payment is required of an apprentice who leaves the trade even though the apprentice received a full four years of apprenticeship training. Likewise, an apprentice would be required to pay pursuant to the SLA even though the apprentice went to work for a non-union employer that was willing to contribute to the Trust Fund by written agreement other than a collective bargaining agreement. However, if this same apprentice began working for an employer who contributed to a trust fund in a different region of the country, such ap-

prentice would not be required to pay the "loan" even though none of the contributions contributed elsewhere in the country would accrue to the benefit of the Denver Local JATC.

22. Courts generally have looked with disfavor on non-competition clauses, also known as "bad boy" clauses, when such clauses affect the distribution of plan benefits. Courts recognize that in most cases such clauses are not solely for the benefit of the plan participants and that the clauses therefore violate the provision of ERISA. *Frary v. Shorr Paper Products, Inc.,* 494 F.Supp. 565 (N.D.Ill.1980).

23. In *Deak v. Masters, Mates & Pilots Pension Plan, supra,* the Eleventh Circuit held that pension plan trustees acted arbitrarily and capriciously by amending a plan to make the length of a suspension on reemployment dependent on whether reemployment was with a union or non-union employer. The court observed that the trustees failed to prove in amending the plan that the differing penalties were based on any solid actuarial determination and that the trustees did not show that they had considered less restrictive methods to accomplish their purported goal of protecting the trust fund. 821 F.2d at 581.

Payback/Credit is Arbitrary

24. Plaintiffs failed to prove there is any logical basis for the cost calculation associated with either the Supplement Agreement or the SLA. Plaintiffs have assessed the cost of training in an arbitrary and capricious manner and through a mechanism which does not represent the actual cost of training or loss of revenues to the Trust Funds.

25. Plaintiffs have failed to prove any credible basis for the $1,000 "intangible" cost. This amount primarily represents time spent by volunteers which are otherwise not compensated. This amount is unreasonably charged for each year of apprenticeship training, and for each journeyman class, and is without legal or factual support.

*Unenforceable As Implemented*

26. In 1981 and 1982 six of the defendants entered into an Apprenticeship Agreement with the Local JATC. This Agreement provided, *inter alia,* that the JATC would "cause the apprentice to be employed for the purpose of enabling the apprentice to learn the trade or craft of sheet metal upon the terms and conditions contained in the Apprenticeship Standards which are made a part of this Agreement."

27. There were no provisions contained in the Apprenticeship Agreement for the repayment of the cost of training. The Apprenticeship Standards specifically provided that the fees to be paid by an apprentice were "None". The section of the Standards titled "Obligation of the Apprentices" did not indicate any apprentice would be required to pay for the cost of training.

28. In 1984 the six defendants who signed the 1981 Supplement Agreements were required to sign new contracts, the SLA. The apprentices were told that if they failed to sign the new agreements they would be cancelled from the Apprenticeship Program and terminated from their employment. The SLA increased the obligation of the apprentices from one or two years to at least ten years, and increased the geographic scope of enforcement from the State of Colorado to the entire United States.

29. The defendants received nothing more than that which they were lawfully entitled to receive under the Apprenticeship Agreements, that is, the necessary apprenticeship training. The refusal of Local JATC to perform its obligation to train defendants without a requirement that the Agreements be signed is unlawful for lack of consideration.

30. The Trust Funds are funded by Employer contributions. The Trust Agreements require the Trustees to provide training to apprentices and journeymen. The Trust Agreements do not contemplate requiring trainees to pay for the cost of training. The Trust Agreements indicate that the purpose of the Fund is to "defray" the cost of training apprentices. There is no consideration for the signing of the Supplement Agreements or the SLA since the

apprentices received only that which the Trustees were already required to provide.

### Seek or Accept

■ 31. The Agreements provide that upon completion of the training the apprentice will neither seek nor accept employment from a non-union sheet metal employer. Plaintiffs argue that four of the defendants are in violation of the "seek or accept" language by continuing to work for an employer who has gone non-union, because each defendant had continued to "accept" employment from a non-contributing employer after the employer's change in status with the union.

32. The Court concludes that the words "seek or accept" contained within the Agreements are unambiguous. Language in a contract should be given its plain and ordinary meaning, unless the agreement directs otherwise. *Home Life Insurance Co. of N.Y. v. Stewart*, 114 F.2d 516, 517 (10th Cir.1940). Given its ordinary meaning, to "accept employment" means to "accept a new job offer". Therefore the Court finds and concludes that defendants who continued employment with their employer after July 1, 1987 (after the employer refused to sign a new collective bargaining agreement), are not in violation of the "seek or accept" condition set forth in the Agreements.

### Completion of Training

■ 33. The Court concludes that the ordinary meaning of "completion of training" means "to undergo training successfully to the finish". In the circumstance where defendants did not successfully finish the training course, the defendant cannot be in breach of the Agreements for leaving the program and going to work for a non-union competitor.

### Duress and Coercion

The Court finds that the evidence was inconclusive for the Court to make a determination on defendants' defenses of duress and coercion.

### CONCLUSION

■ From the evidence submitted to the Court by the parties, and from the exhibits, pleadings and briefs, the Court finds and concludes that plaintiffs have failed to meet the burden of proving their claim for breach of contract.

Under the evidence the Court finds in favor of the defendants. Defendants have met their burden in proving that the Supplement Agreement and Scholarship Loan Agreements are invalid and unenforceable as a matter of law.

### Attorney Fees

Under 29 U.S.C. § 1132(g)(1) the Court in its discretion may allow a reasonable attorney fee and cost of action to the prevailing party.

The standards to be applied in awarding attorney fees are as follows:

(1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to personally satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances;

(4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question; and

(5) the relative merits of the parties' positions. *See, Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983); *Evans v. Penn*, 587 F.2d 453 (10th Cir.1978).

In reviewing these standards, the Court has been furnished sufficient evidence in the record to determine that the Trust Funds were conducted in a manner contrary to ERISA obligations, that the Trustees acted in bad faith or with an improper motive and have breached their fiduciary responsibilities. An award of attorney fees against the Trust Fund and the Trustees may deter the Trustees from continuing to enforce collection against other apprentices and journeymen. Further, the defendants

herein are seeking to benefit not only themselves but also all other apprentices and journeymen who were required to sign the Agreements. However, the Court has received insufficient evidence of the current financial status of the Trust Funds, therefore the Court has insufficient evidence to determine the ability of the Funds to satisfy an award of attorney fees.

The Court directs the defendants' attorney to submit within twenty (20) days from the filing of this Order, by affidavit, an accounting of reasonable attorney fees and costs expended in defense of this action.

Plaintiffs' attorney is to respond to defendants' application within twenty (20) days thereafter setting forth specific objections, if any, to defendants' application and providing factual data as to the ability of the Funds to satisfy any such award.

## ORDER OF THE COURT

ACCORDINGLY, the Court finds in favor of the defendants Glenn E. Chapman, Peter V. Germann, William Craig Peterson, Jr., Kirk Harris, Edward Alan Thomas, David E. Boehm, James H. Lee, David J. Cuthbertson, Matthew J. Babcock, James R. Pech and Donald Mark Flansburg, and against the plaintiffs Joint Apprenticeship and Training Committee of Sheet Metal Workers' International Association, Local No. 9, a Trust; William Stephens and Don Lawson, Trustees; National Training Fund for the Sheet Metal and Air Conditioning Industry, a Trust; and James E. Roth and Edward J. Carlough, Trustees.

IT IS SO ORDERED.