698 F.2d 320
 Fed. Sec. L. Rep. P 99,059, Fed. Sec. L. Rep. P 99,162,
3 Employee Benefits Ca 2590,
4 Employee Benefits Ca 1566
The PEORIA UNION STOCK YARDS COMPANY RETIREMENT PLAN, et
al., Plaintiffs- Appellants,
v.
The PENN MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.
 No. 82-1720.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 5, 1982.
Decided Jan. 20, 1983.
Opinion on Denial of Rehearing April 4, 1983.
 
 Edward F. Sutkowski, Sutkowski & Washkuhn Assoc., Peoria, Ill., for plaintiffs-appellants.
 Roger E. Holzgrafe, Westervelt, Johnson, Nicoll & Keller, Peoria, Ill., Lawrence J. Latto, Benjamin W. Boley, Shea & Gardner, Washington, D.C., for defendant-appellee.
 Before PELL and POSNER, Circuit Judges, and BONSAL, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 This appeal brings up to us a variety of questions relating to the regulation of pension plans--in particular whether an insurance company that sells a "group deposit administration annuity contract" to pension trustees is subject to the anti-fraud provisions of the federal securities laws and to the fiduciary obligations imposed by ERISA, the federal law regulating pensions.
 
 
 2
 The plaintiffs are the pension plan set up by the Peoria Union Stock Yards Company for its salaried employees; the trustees of the plan's assets; and beneficiaries of the plan. The plan is a "defined-benefit" plan; that is, it specifies the benefits that the beneficiary is to receive during retirement. See 1 CCH Pension Plan Guide p 2423 (1981). When he retires the plan buys him an annuity that pays him the specified benefits annually for the rest of his life. And the plan is "funded," meaning that the employer must make annual contributions at a level that, combined with the income from investing the contributions, is reasonably calculated to cover the entire cost of the annuities that the plan must purchase for its beneficiaries as they retire. If there is not enough money in the plan when the time comes to buy an annuity for a retiring employee, the employer must make an additional contribution since his obligations to the employees covered by the plan are unconditional.
 
 
 3
 The creation and administration of such a plan require both actuarial and investment skills. Actuarial computations enter into determining the cost of an annuity that will provide the specified benefits to the retiring employee (because the cost is a function in part of the employee's life expectancy) and the level of contributions that the company must make to fund the plan (the level depends in part on how many of the company's employees live to retirement). Investment skills are needed in the accumulation period, when the contributions made by the company are earning interest toward the day they will be used to purchase annuities, and also affect the annuity's cost, which is a function not only of the annuitant's life expectancy but also of the investment income that the money used to buy the annuity will earn while he is drawing benefits.
 
 
 4
 Actuarial computations and investment management are the life blood of life insurance companies, so it is no surprise that such companies offer to lift from employers' shoulders the burdens of designing and administering suitable plans. The defendant in this case, Penn Mutual Life Insurance Company, offered to do just that for the Peoria Union Stock Yards Company in 1970 when the company was thinking of setting up a defined-benefit plan. The company took up the offer, which was for a "group deposit administration annuity contract." Under this type of contract, described in McGill, Fundamentals of Private Pensions, ch. 13 (4th ed. 1979), the insurance company determines what the employer must contribute annually to fund the plan; the contributions are deposited with the insurance company, which invests them as a single account rather than setting up a separate account for each employee; and the funds in the account are commingled for investment purposes with the funds of other customers of the insurance company, in much the same way as investments of different investors are pooled in a mutual fund or common trust fund, in order to obtain diversification while minimizing brokerage and management costs. When an employee retires, the insurance company informs the employer how much the employee's retirement annuity will cost. The employer can purchase the annuity from the insurance company with a portion of the funds on deposit or it can withdraw funds and purchase the annuity from another insurance company.
 
 
 5
 The contract was signed and took effect in 1971. This suit, a suit for damages, was brought in 1980. The complaint alleged that the contract between Penn Mutual and the pension trustees was a security within the meaning of the federal securities laws, that Penn Mutual was a fiduciary under ERISA, and that it had fraudulently marketed and administered the contract in violation of federal and Illinois securities laws, ERISA, and the common law of Illinois, and on top of all this had broken the contract. The district court dismissed the complaint for failure to state a claim, 518 F.Supp. 1302 (C.D.Ill.1981), the plaintiffs filed an amended complaint which the district court again dismissed for failure to state a claim, and this appeal followed.
 
 
 6
 According to the amended complaint, Penn Mutual actively promoted the group deposit administration annuity concept to the trustees after having designed a defined-benefit plan for them. The contract provided for the employer's contributions to be paid into a deposit account at Penn Mutual. Penn Mutual would guarantee interest on contributions made during the first three years of the contract at a rate declining from 7 1/2 percent to 3 1/2 percent over the period these contributions were on deposit. Interest on contributions made after the first three years was to be credited to the deposit account "at such rates as shall be determined by Penn Mutual," but it was also provided that "this contract shall participate in divisible surplus while it is in force. Dividends of such surplus, if any, to be apportioned to this contract shall be determined annually by the Board of Trustees of Penn Mutual ...." The plaintiffs, not implausibly, interpret this to mean that to the extent money in the deposit account earned interest above the interest guarantee, which was zero on contributions made after the third year of the contract, the interest must be credited to the deposit account--Penn Mutual could not pocket it. Penn Mutual's counsel so conceded at oral argument.
 
 
 7
 The contract also specified a modest expense charge if the annual contribution fell below a certain level, a modest surrender charge if the contract was terminated, unless the deposit account was used to buy annuities from Penn Mutual, and one other small charge--all to be deducted from the deposit account. If the pension plan's trustees terminated the contract, as they were allowed to do upon notice, Penn Mutual was to pay over to them "the net value" of the deposit account, but it could spread payment over a period of five years. During this time it had to credit interest to the deposit account at an annual rate of 3 percent.
 
 
 8
 Between 1972 and 1980 Penn Mutual provided the trustees with an annual "deposit funds summary," showing the plan's contributions, interest credited, money withdrawn to buy annuities, expense charges, and the ending balance in the deposit account. The summaries showed interest being credited at annual rates of between 6.4 and 7.3 percent, and trivial expense charges, dropping from $423 in 1972 to $67 in 1976 and zero thereafter. Only two employees covered by the plan retired during this period and the withdrawals required to buy annuities for them were small--$38,000 and $43,000, compared to annual contributions to the plan that rose from $33,000 in 1972 to $85,000 in 1980.
 
 
 9
 Then in May 1980 one of Peoria Union Stock Yards' senior executives reached retirement age. Penn Mutual told the trustees it would charge them $432,000 for the annuity required to provide this employee with the benefits to which he was entitled under the plan. The trustees decided to shop around. They found they could buy the same annuity from another insurance company for only $310,000. (At oral argument Penn Mutual's counsel said it was not the same annuity, but we are just stating the facts as alleged in the complaint.) They began asking questions and discovered that Penn Mutual compiled, but did not disclose, annual "internal account summaries" of the deposit account. These summaries showed the same annual contributions by the pension plan as the accounts sent to the trustees, but everything else was different. The interest credits were higher, ranging from 6.3 to 8.1 percent, and so were the expenses charged against the deposit account. The expenses were in three categories-- "valuation fee," "commissions," and "general administration and payment charges"--and they grew over time rather than declining as did the expenses shown in the deposit fund summaries; in 1979 they came to almost $6,700. But because the extra interest credited in the internal account summaries exceeded the extra expenses debited in them, the ending balances were higher in the internal account summaries than in the deposit fund summaries. Penn Mutual explained that a group deposit administration annuity contract is (though not so described in the contract itself) a "rear-end load contract in which contractholder does not see actual expenses.... Only the guaranteed rates of interest are credited even if 'new money' rates are higher. Usually it takes several years for contract to be in a dividend position."
 
 
 10
 When the trustees discovered all this, they exercised their right of termination. Penn Mutual told them they were entitled to receive $756,000, which was the ending balance in the latest fund summary, but that if they wanted immediate payment rather than payment over five years they would get only $537,000.
 
 
 11
 The plaintiffs' federal securities law claims are based on section 17(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77q(a), and on the SEC's Rule 10b-5, 17 C.F.R. Sec. 240.10b-5, promulgated under the Securities Exchange Act of 1934, see 15 U.S.C. Sec. 78j(b). Both section 17(a) and Rule 10b-5 forbid using misrepresentations (including omissions of material fact) to sell "securities," defined in both the 1933 and 1934 acts to include "any ... investment contract," 15 U.S.C. Secs. 77d(1), 78c(a)(10). Whether section 17(a) can be enforced by private damage suits is an open question in this circuit, though the prevailing view elsewhere is that it can be, see Stephenson v. Calpine Conifers II, Ltd., 652 F.2d 808, 815 (9th Cir.1981); but it is not a terribly important question. Rule 10b-5 tracks section 17(a) closely, and the right to bring a private damage action for violations of Rule 10b-5 is well established, whatever one may think of this right as an original matter, see Trecker v. Scag, 679 F.2d 703, 711 (7th Cir.1982) (concurring opinion). The 1933 act has an exemption for contracts issued by insurance companies in connection with pension funds, 15 U.S.C. Sec. 77c(a)(2), but it is inapplicable to suits under section 17, see 15 U.S.C. Sec. 77q(c). The plaintiffs also rely on the Illinois Securities Law of 1953, the relevant provisions of which are identical to those of federal securities law, see Ill.Rev.Stat.1981, ch. 121 1/2, paragraphs 137.2-1, 137.12(G). The Illinois Securities Law does not create an express private right of action for damages, see id. p 137.13, as distinct from rescission, see id. p 137.13(A), which is not the same thing and is not what the plaintiffs in this case want. Hiddell v. International Diversified Investments, 520 F.2d 529, 532 n. 3 (7th Cir.1975) (per curiam), seems to hold that damages suits are possible under the Illinois Securities Law, but without discussion of the question, and it is possible that the court was confusing rescission with damages. But it is not a question we need to resolve at this stage in the present litigation.
 
 
 12
 There can be no serious doubt that the amended complaint alleges material misrepresentations by Penn Mutual in selling the group deposit administration annuity contract to the Peoria Union Stock Yards pension trustees, in particular misrepresentations concerning how much of the income from investing the plan's funds would be credited to the plan rather than retained by Penn Mutual. And the allegations are sufficiently detailed to satisfy the requirement of Fed.R.Civ.P. 9(b) that fraud be pleaded with particularity. See Denny v. Barber, 576 F.2d 465, 469 (2d Cir.1978). The interesting question--one of first impression--is whether the contract was an investment contract.
 
 
 13
 The term "investment contract" is a catch-all to bring within the securities acts interests that have the functional attributes of stock and other formal securities but are not so denominated. Mutual-fund shares are of course securities; but if you hand over your money to someone to invest in his securities portfolio, and he promises to remit to you your proportional share of the income of the portfolio, minus his charges, but does not call your fractional interest a "share," you and he have an investment contract, and it too is a security within the meaning of the federal and Illinois securities acts. Moreover, it makes no difference that you are a person of some financial sophistication--as we may assume the Peoria Union Stock Yards pension trustees were and are--and that he is an insurance company. All this is clear from SEC v. W.J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946), which defined an investment contract for purposes of federal securities law as a contract "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter ...," and from SEC v. Variable Annuity Life Ins. Co. of America, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) ("VALIC "), which held that variable annuity contracts issued by insurance companies are investment contracts under the 1933 act.
 
 
 14
 True, in considering the argument that such contracts are within that act's exemption for "any insurance or ... annuity contract" issued by a regulated insurance company, 15 U.S.C. Sec. 77c(a)(8), the Court in VALIC pointed out that "in common understanding 'insurance' involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts.... The companies that issue these annuities ... guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities--an interest that has a ceiling but no floor." 395 U.S. at 71-73, 79 S.Ct. at 621-23 (footnotes omitted). In this case there is a floor: the guaranty of a minimum fixed interest return on the contributions the employer makes to the deposit account during the first three years of the contract. But in this respect the contract is no different from the "Flexible Fund Annuity" contract that the Supreme Court held to be a security in SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967). The purchaser was required to make fixed annual contributions till maturity, at which time he could either withdraw his contributions, plus whatever earnings had accumulated through the insurance company's investment of those contributions, or use them to purchase an annuity from the company. In either case the company guaranteed him a minimum value at maturity, but a low minimum: "United set its guarantee by analyzing the performance of common stocks during the first half of the 20th century and adjusting the guarantee so that it would not have become operable under any prior conditions." 387 U.S. at 209 n. 12, 87 S.Ct. at 1561 n. 12. The minimum in the present case was even lower; it was nonexistent for contributions made after the third year.
 
 
 15
 It is true that in both VALIC and United Benefit the insurance company was investing in common stocks. We do not know in what types of instrument Penn Mutual was investing the funds in the Peoria Union Stock Yards deposit account--but we do not see what mileage Penn Mutual can get in this antifraud lawsuit from having failed to inform the investor of what types of investments it intended to make on the investor's behalf.
 
 
 16
 United Benefit also held that it is proper to decompose an annuity contract into an investment contract during the accumulation phase and an insurance contract during the annuity phase. See 387 U.S. at 207, 87 S.Ct. at 1559. "The 'Flexible Fund' program completely reverses the role of the insurer during the accumulation period. Instead of promising to the policyholder an accumulation to a fixed amount of savings at interest, the insurer promises to serve as an investment agency and allow the policyholder to share in its investment experience." 387 U.S. at 208, 87 S.Ct. at 1560. It is the same here. Until money is withdrawn from the deposit account to purchase an annuity for a retiring employee, the insurance company is offering the pension plan a chance to share in the insurance company's investment experience. The complaint alleges that in soliciting the contract Penn Mutual represented itself as having investment skills which it could put to work for the pension trustees, and that in the contract itself, which states "this contract shall participate in divisible surplus while it is in force," Penn Mutual promised to credit the deposit account with all investment income on the employer's contributions, net of the modest specified charges. If these allegations are true, the group deposit administration annuity contract was an investment contract during the accumulation phase. The "common enterprise," in the language of Howey, was Penn Mutual's investment portfolio; any profits of the enterprise were due solely to the efforts of the promoter, Penn Mutual; and those profits were to be credited to the Peoria Union Stock Yards deposit account in proportion to its share in the portfolio. It was as if the pension trustees had bought shares in a mutual fund.
 
 
 17
 It is true that in this case, unlike United Benefit, the annuitant himself--the employee--does not bear, at least directly, the investment risk created by the contract. His benefits are fixed; that is the essence of a defined-benefits plan. But he is not the investor. The investor is the employer, operating through the pension plan that it has created. The employer bears the investment risk, because while its obligations to its participants are fixed the income available to fund those obligations fluctuates with the investment experience of Penn Mutual. The better that experience is, the less the employer must contribute to the purchase of annuities; the worse the experience, the more it must contribute.
 
 
 18
 This does, though, raise a serious question whether employees covered by the pension plan, who are plaintiffs in this suit along with the plan and its trustees, have a cause of action under the securities laws. International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), suggests they do not. See also Black v. Payne, 591 F.2d 83, 86-88 (9th Cir.1979); Salazar v. Sandia Corp., 656 F.2d 578, 581-82 (10th Cir.1981); cf. Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250, 1261-62 (10th Cir.1969). This is hardly important, however, since the trustees have standing. They signed the contract and were therefore the purchasers of the security. The plan itself does not have standing. The assets of the plan are of course held in trust, and must be, see 29 U.S.C. Sec. 1103(a), but the trustee is the proper party to sue on behalf of the trust. 4 Scott on Trusts Sec. 280 (1967). It is true, as we shall see, that ERISA confers on pension plans standing to sue for breach of fiduciary obligations under ERISA, but it does not purport to confer standing to sue under other statutes.
 
 
 19
 But since the trustees have standing to sue, we disagree with the district judge that the amended complaint fails to state a claim under federal and state securities laws. Nor are we persuaded by his alternative holding that the plaintiffs' securities law claims are barred by the three-year statute of limitations in the Illinois Securities Law, Ill.Rev.Stat.1981, ch. 121 1/2, p 137.13(D), which the parties agree, as they must, Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir.1972), applies to both the state and federal securities law claims. Penn Mutual argues that the alleged misrepresentations occurred in 1970 and 1971 and thus were time-barred when the complaint was filed. The premise is incorrect, and the conclusion does not follow. The deposit fund summaries that Penn Mutual sent the pension fund every year while the contract was in force were misleading and the failure to disclose the internal account summaries was a material omission that also continued throughout the contract period. These "lulling activities" would be actionable as part of the original sale of the group deposit administration annuity contract even if that sale had been otherwise complete in 1971, see SEC v. Holschuh, 694 F.2d 130, 143-44 (7th Cir.1982), but in fact the contract called for periodic contributions and was therefore a continuing contract. To keep these contributions coming through fraud was fraud in connection with the continuing sale of a security.
 
 
 20
 In any event, the complaint and attached documents, which constitute the entire factual record in this case, provide no basis for an inference that the plaintiffs knew or had reason to know of the misrepresentations until their suspicions were aroused by the high price that Penn Mutual charged for the first big annuity to come due under the plan, which was not till 1980. The statute of limitations in a securities fraud case is tolled if the seller keeps the buyer from learning that the seller used misrepresentations and omissions to make the sale. Parrent v. Midwest Rug Mills, Inc., supra, 455 F.2d at 128.
 
 
 21
 The complaint also alleges violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001 et seq. (ERISA), which although enacted after the contract between Penn Mutual and the pension trustees went into effect is conceded to be applicable to it. The plaintiffs allege that Penn Mutual was a fiduciary under the act and breached its fiduciary obligations. The participants, the trustees, and the plan itself all have standing to complain of such a breach. See 29 U.S.C. Secs. 1109(a), 1132(a)(2), (d)(1). And there is little doubt that if Penn Mutual was a fiduciary, the alleged misrepresentations and omissions were breaches of its fiduciary obligations. Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA, 29 U.S.C. Sec. 1104(a)(1).
 
 
 22
 Penn Mutual may also have violated specific fiduciary obligations imposed by ERISA--for example, the obligation in 29 U.S.C. Secs. 1106 and 1108(b)(2) not to charge excessive compensation for its services--by refusing to pay over to the trustees the full ending balance (minus the very modest termination fee fixed in the contract) all at once when the contract was terminated. True, the contract provided for payment over five years at the extremely modest interest rate of 3 percent, so if the pension plan wanted immediate payment it had to expect to receive less. However, the provision allowing Penn Mutual to have use of these funds for five years at below-market interest rates was a form of compensation to Penn Mutual, and maybe of excessive compensation. If this is what the plaintiffs are complaining about, their allegations are sufficient. But Penn Mutual's refusal to pay all at once was not, as the plaintiffs argue, an additional charge, so long as the immediate payment offered was not less than the present value of the deferred payment that the contract called for.
 
 
 23
 The critical question, again one of first impression, is whether Penn Mutual was an ERISA fiduciary. "[A] person is a fiduciary with respect to a [pension] plan to the extent [that] (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets...." ERISA Sec. 3(21)(A), 29 U.S.C. Sec. 1002(21)(A). But "in the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not solely by reason of the issuance of such policy, be deemed to include any assets of such insurer." ERISA Sec. 401(b)(2), 29 U.S.C. Sec. 1101(b)(2).
 
 
 24
 The point of this exception emerges from the definition of the term "guaranteed benefit policy" as "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." ERISA Sec. 401(b)(2)(B), 29 U.S.C. Sec. 1101(b)(2)(B). When an insurance company issues an insurance contract, such as an annuity, the premiums become assets of the company and are invested along with the company's other investment assets. If it were not for section 401(b)(2), the definition of a fiduciary as anyone who "exercises any authority or control respecting management of ... [the pension plan's] assets" might make the insurance company a fiduciary, since it manages assets--the premiums it receives from the pension plan--that are in a sense assets of the plan as well. Congress did not want to make an insurance company that sells a standard annuity contract--one that provides "benefits the amount of which is guaranteed by the insurer"--a fiduciary toward the purchaser of the contract. But that is not what Penn Mutual sold here. The pension trustees did not buy an insurance contract with a fixed payout; they turned over the assets of the pension plan to Penn Mutual to manage with full investment discretion, subject only to a modest income guaranty. If the pension plan had hired an investment advisor and given him authority to buy and sell securities at his discretion for the plan's account, the advisor would be a fiduciary within the meaning of the act, and that is essentially what the trustees did during the accumulation phase of the contract with Penn Mutual.
 
 
 25
 We conclude that the complaint states a claim under ERISA. (Penn Mutual's statute of limitations argument on the ERISA count parallels that in the securities counts and does not require separate discussion.) But we do not think this conclusion permits us to qualify our earlier conclusion that Penn Mutual is also subject to the anti-fraud provisions of the securities laws. It is true that the Supreme Court in International Brotherhood of Teamsters v. Daniel, supra, 439 U.S. at 569-70, 99 S.Ct. at 801-02, said that one of its reasons for holding that the interest of a pension plan beneficiary was not a security was that his interest was protected by ERISA. But, in context, all this meant was that ERISA was one more reason why the beneficiary did not bear any appreciable investment risk. See also Marine Bank v. Weaver, 455 U.S. 551, 102 S.Ct. 1220, 1224 n. 7, 71 L.Ed.2d 409 (1982). Nothing in ERISA shields pension trustees from investment risk. Maybe they do not really need protection under the securities laws from fraud when ERISA gives them so much protection, but this observation would not justify our holding that ERISA had repealed a portion of the securities acts by implication unless giving the trustees rights under the anti-fraud provisions of the securities acts would interfere with ERISA's objectives, and we can think of no reason why it would.
 
 
 26
 The district judge's dismissal of the common law counts in the complaint requires only brief discussion. He threw out the fraud count because it had not been pleaded with sufficient particularity to satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and because it was barred by the statute of limitations, and the contract count because he thought it apparent from the terms of the contract that Penn Mutual had not broken it. We disagree with these grounds for dismissal. Fraudulent concealment tolls the statute of limitations on a common law fraud claim as on a securities claim in Illinois, see Tarpoff v. Karandjeff, 17 Ill.2d 462, 470, 162 N.E.2d 1, 5 (1959); the amended complaint pleads the alleged fraud in adequate detail; and Penn Mutual's failure to credit the deposit account with the full investment income earned on it minus just the contractually specified charges appears to violate the provision of the contract entitling the pension plan to participate pro rata (for so the reference to apportionment may be understood) in divisible surplus. We do not think it necessary to consider whether the plan or its participants have standing to prosecute the common law claims, since the trustees clearly do.
 
 
 27
 We do not hold that Penn Mutual has violated any legal duty to the plan or its trustees and beneficiaries; that cannot be determined from the pleadings. But we believe the district court erred in concluding that the amended complaint failed to state a claim under federal and state securities law, ERISA, and the common law of Illinois. The judgment is therefore reversed and the case remanded for further proceedings consistent with this opinion. As we are authorized to do by Circuit Rule 18, we direct that those proceedings be conducted by a different district judge.
 
 
 28
 SO ORDERED.
 
 ORDER DENYING PETITION FOR REHEARING
 
 29
 The appellee has filed a petition for rehearing and we permitted it to file a supplemental memorandum of law by counsel newly hired since the panel handed down its decision. The petition seeks essentially clarification and modification based on a number of arguments and authorities that the appellee's original counsel had not drawn to the attention of the court. In view of the fact that the panel decision merely reverses the dismissal of the complaint under Fed.R.Civ.P. 12(6)(b), the case is at an early stage and the appellee will have ample opportunity to present its arguments to the district court consistently with the flexible contours of the doctrine of law of the case.
 
 
 
 *
 Of the Southern District of New York