TRUSTEES OF LABORERS' LOCAL
NO. 72 PENSION FUND,
Plaintiff,

v.

NATIONWIDE LIFE INSURANCE
COMPANY, Defendants.

Civ. No. 89–719 (HLS).

United States District Court,
D. New Jersey.

Feb. 24, 1992.

Andrew F. Zazzali, Jr., Zazzali, Zazzali, Fagella & Nowak, Newark, N.J., for plaintiff.

Eugene M. Haring, McCarter & English, Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Before the court are plaintiff's and defendant's motions for summary judgment.

## BACKGROUND

This case arises from a dispute over a group annuity contract ("the Contract") issued by defendant Nationwide Life Insurance Company ("Nationwide") to plaintiff, the Trustees of the Laborer's Union No. 72 Pension Fund ("Trustees"). The Contract was issued on December 31, 1971.[1] Plaintiff Exh. 1. Prior to entering into the Contract, the Trustees established a Pension Plan ("the Plan") for participants in the Laborer's Union No. 72 Pension Fund. The Plan provided for payment of benefits to participants upon their retirement. The Contract provided that the Trustees would invest Plan monies in one of several funds established by Nationwide. In turn, Nationwide agreed, *inter alia*, to pay or purchase annuities for Plan beneficiaries entitled to pensions under the terms of the Plan.

The Contract provided for the creation of two types of funds: Guaranteed Funds, to be credited with a rate of interest as determined by the greater of a rate specified in the Contract and its amendments and the "Net Investment Rate" of return earned by the guaranteed fund, as determined by Nationwide; and Variable Funds, which were not guaranteed, but credited with an effective investment return based on the investment income and market value of assets held in the account. Plaintiff Exh. 2., Arts. II & III.[2] Contributions to either or both types of fund were to be made by the Trustees at their discretion, up to a maximum annual contribution.[3] *Id.* at Art. IV. The Contract provided that the Trustees were to give notice to Nationwide to provide an annuity for Plan participants when they became eligible for a pension under the Plan. *Id.* at Art. V. Upon receipt of such notice, Nationwide agreed to make annuity payments from the Guaranteed Fund to the beneficiary in an amount determined in accordance with the Plan. *Id.* at Art. VI. However, upon the occurrence of certain events, including notice by the Trustees, termination of the Plan, and the event that balances in the Guaranteed Fund fell below a certain level, the Contract provided that Nationwide would purchase annuities for each participant entitled to receive a pension with funds withdrawn from the Guaranteed Fund.[4]

Over a period of time through 1986, the Trustees remitted contributions from participating employers to Nationwide for deposit in one of several Guaranteed Funds as prescribed by the Contract. Plaintiff Brief at 7. In 1987, the Trustees requested that Nationwide return the sums invested in the Guaranteed Funds to the Trustees. *Id.* at 8, Def. Brief at 4. Nationwide apparently responded that, pursuant to its interpretation of the termination provisions of the Contract, it was obliged and intended to

---

1. The Plan was amended on several occasions, primarily to alter interest and annuity purchase rates. See Plaintiff Exs. 2–8.

2. References are to the 1982 Amended version of the Contract.

3. Apparently, no contributions were made to the Variable Fund, and no claim regarding a Variable Fund is at issue in this suit.

4. The purchase price of such annuities would be not greater than rates included in the Contract and its amendments. However, if the amount

required was greater than the balance of the Guaranteed Fund, the Contract provided that Nationwide would cover these payments with transfers from any balances in Variable Funds. If the Guaranteed Fund balance was still insufficient and a supplementary contribution was not forthcoming from the Trustees, the Contract provided that Nationwide should purchase annuities only up to the amount of the Guaranteed Fund balance. *Id.* at Art. VI.

purchase annuities from itself for all eligible participants. This arrangement was unacceptable to the Trustees, who offered to assume all obligations for the payment of retirement benefits to Plan participants and to enter a hold harmless agreement, defending Nationwide from any claims for benefits. The parties were unable to resolve their differences, and this litigation followed.

Plaintiff claims that defendant was a fiduciary with respect to Plan benefits [5] and, as such, violated duties owed to plaintiff under the Employee Retirement Income Security Act (ERISA). In particular, the Trustees claim that Nationwide's inclusion and insistence on application of the termination procedure in the Contract, providing that Nationwide purchase its own annuities upon the termination of the Contract, represented a *per se* violation of ERISA's prohibition of self-dealing; that, even if it is not a *per se* violation, such self-dealing violates ERISA where defendant failed to investigate other sources of annuities available at lower cost; and that Nationwide violated its fiduciary duties by breaching the express terms of the Contract, which was itself a Plan asset.[6] Plaintiff further claims that the Contract was "perpetual in violation of ERISA, and that based on considerations of fairness and unconscionability, this court should impose a reasonable contract termination date on the contract, reflecting plaintiffs' desire to terminate it immediately."

Plaintiff has moved for summary judgment on all its claims, seeking termination of the Contract, return of the funds to plaintiff with no deductions, an accounting from Nationwide for interest allegedly owed due to Nationwide's averaging of Guaranteed Interest Rates and for profits realized by Nationwide through debiting expenses from higher yielding funds, declaratory relief, attorney fees, and punitive damages.

Defendant has also moved for summary judgment, on several bases. Nationwide asserts that, as the issuer of a group guaranteed annuity contract, it is not an ERISA fiduciary. Further, Nationwide claims that even if it were not exempt from fiduciary status, it exercised no discretion with respect to the administration of the Plan, and hence violated no fiduciary duties. Nationwide also argues that it was contractually entitled to issue its own annuities to Plan beneficiaries upon termination, that such annuities were competitive with market rates, and that Nationwide derived no benefit from their issuance. On these grounds, Nationwide urges that this action should be dismissed and summary judgment entered in its favor.

## DISCUSSION

In order to prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that, viewing the facts in the light most favorable to the non-movant, the movant will prevail as a matter of law. Fed.R.Civ.P. 56. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 84 (3d Cir. 1987).

The court will address the issue of whether Nationwide was a fiduciary subject to ERISA and, if so, whether it violated fiduciary duties imposed by ERISA,

---

**5.** Plaintiff asserts that even if defendant was not a fiduciary initially, it became one by exercising its alleged right to unilaterally amend the Contract.

**6.** Plaintiff charges that Nationwide breached the contractual requirement to credit the Funds with the greater of the guaranteed rates and the Net Investment Rate by its practice of averaging guaranteed rates applicable to different portions of the Guaranteed Fund. As set forth in the Contract and its amendments, contributions credited to the Guaranteed Fund in different time periods were to receive different rates of interest. Plaintiff Exh. 2, at Art. I. In several years, the interest rates associated with certain portions of the fund were exceeded by the Net Investment Rate. However, when the interest rates associated with all portions of the fund were averaged, the result was that the margin by which the Net Investment Rate exceeded the Guaranteed Interest Rate was reduced, thereby reducing the interest contribution to the Guaranteed Fund. Plaintiff also claims that Nationwide breached its contractual agreement by debiting administration expenses from the highest yielding Guaranteed Fund accounts.

with respect to the following alleged actions: (1) including in the Contract a provision that Nationwide would buy its own annuities upon termination of the Contract; (2) purchasing such annuities from itself after amendment of the Contract by Nationwide; (3) crediting the Guaranteed Fund with interest based on the actual return earned by the Fund (in the event that this rate exceeded the Guaranteed Interest Rate); (4) averaging guaranteed rates before applying the Net Investment Rate to Guaranteed Fund assets; (5) debiting expenses from high yielding accounts; and (6) including in the Contract no fixed date for termination of the Contract.

## EXEMPTION FROM FIDUCIARY STATUS UNDER 29 U.S.C. § 1101(b)

Under ERISA, "a person is a fiduciary with respect to a plan to the extent ... he ... exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). However, ERISA also includes an exception to the coverage of ERISA, and hence to the reach of ERISA's fiduciary duties, applicable to certain insured benefit policies:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer. For purposes of this paragraph ... [t]he term "guaranteed benefit policy" means an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus in a separate account, but excludes any other portion of a separate account.

29 U.S.C. § 1101(b). The legislative history of this provision, as embodied in the Conference Committee Report, states that:

> An insurance company ... is not considered to hold plan assets if a plan purchases an insurance policy from it, to the extent that the policy provides payments guaranteed by the company. If the policy guarantees basic payments, but other payments may vary with, e.g., invest-

ment performance, then the variable part of the policy and the assets attributable thereto are not considered to be as guaranteed, and are to be considered as plan assets subject to the fiduciary rules.

Joint Explanatory Statement of the Conference Committee, H.R. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News, 4639, 5038, 5077.

Further light is shed on the meaning of § 1101's exemption to ERISA's coverage by regulations enacted by the Department of Labor, the federal agency in charge of overseeing ERISA, whose views are accordingly entitled to deference unless clearly inconsistent with the law. *Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1411–12 (2d Cir.1985), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). In 1987, this agency enacted regulations defining "plan assets" under ERISA. As one district court has said:

> "[t]he policy animating [this regulation] is to impose ERISA fiduciary obligations upon persons or entities that, practically speaking, have been entrusted with the management and investment of plan assets. The regulation thus 'looks through' the form of an entity to hold it directly liable as a fiduciary with respect to plan assets that have ostensibly been used to purchase an equity interest in that enterprise."

*Associates in Adolescent Psychiatry v. Home Life Insurance Co.*, 729 F.Supp. 1162, 1183 (N.D.Ill.1989), *aff'd*, 941 F.2d 561 (7th Cir.1991). The Department of Labor further explained:

> there are many situations where a plan, although nominally investing its assets in a separate entity, is as a practical matter retaining the persons who manage the entity to provide investment management services for the plan. For example, some institutional managers—such as banks and insurance companies—have traditionally pooled the assets of several plans for purposes of collective investment, and plans typically participate in such a fund by acquiring in-

vestment units evidencing an interest in the fund.

Department of Labor, Final Regulation Relating to Definition of Plan Assets, 51 Fed. Reg. 41,262 (1986) (cited in *Associates*, 729 F.Supp. at 1183).[7]

Accordingly, 29 C.F.R. § 2510.3–101(h) states that:

> when a plan acquires or holds an interest in any of the following entities, its assets include its investment and an undivided interest in each of the underlying assets of the entity.

Among the listed entities is:

> [a] separate account of an insurance company, other than a separate account that is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited, to the plan and to any participant or beneficiary of the plan (including an annuitant) are not affected in any manner by the investment performance of the separate account.

However, regulations enacted prior to § 2510.3–101, and continuing to apply subsequent to its enactment, make clear that the "plan asset" designation does not apply to a plan's interest in an insurance company's general account:

> If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction.[8]

29 C.F.R. § 2509.75–2 (1982).

 In *Mack Boring and Parts v. Meeker Sharkey Moffitt*, 930 F.2d 267 (3d Cir. 1991), the Third Circuit has recently ruled on the scope of the exception created by 29 U.S.C. § 1101 to ERISA's fiduciary duty rules. In *Mack*, the Third Circuit identified two primary prerequisites which must be met in order for a Plan's investment in an

---

7. The rationale for exempting general accounts, in which funds are pooled for investment purposes, from ERISA's fiduciary obligations has been well explained by commentators: "As a fiduciary, a life insurance company would be required under ERISA to manage its general account assets solely in the interest of participants and beneficiaries of employee benefit plan contractholders and for the exclusive purpose of providing benefits to such participants and beneficiaries. However, ... the assets in the general account are derived from all classes of an insurer's business (i.e., life insurance, health insurance and annuities), and the principal functions which an insurer must perform in managing its business (the selection and control of risks, the investment and management of assets to support obligations with respect to such risks, and the distribution and allocation of surplus among policyholders) require the insurer to consider the interests of all of its contract holders, creditors and shareholders. Therefore, the application of ERISA's exclusive benefit rule would place an insurer in an untenable position of divided loyalties. Indeed, such a standard of conduct would directly conflict with the scheme of state insurance regulation which is designed to assure that an insurer maintain equity among its various constituencies. In addition, as a fiduciary, an insurance company would be prohibited, without govern-

ment approval, from engaging in any investment transaction with a person who is a 'party in interest' to any employee benefit plan contractholder. Because the definition of 'party in interest' is extremely broad, and because insurance companies may provide services to thousands of employee benefit plans, the application of these restrictions would disrupt the vast majority of an insurer's customary investment transactions." Stephen H. Goldberg & Melvin S. Altman, *The Case for the Nonapplication of ERISA to Insurers' General Account Assets*, 21 Tort & Insurance L.J. 475, 476–77 (1986); *see also Oversight on ERISA: Hearings on Public Law 93–406 before the Subcommittee on Labor Standards of the House Committee on Education and Labor*, 94th Cong., 1st Sess. 390–91 (1975) (statement of Paul J. Fasser, Jr., Assistant Secretary of Labor for Labor Management Relations).

8. The Third Circuit has rejected the suggestion that this regulation applies only to the prohibited transaction sections of ERISA, concluding that it "speaks authoritatively with respect to plan asset identification," and hence removes general account assets from the ambit of all ERISA fiduciary duties. *Mack Boring and Parts v. Meeker Sharkey Moffitt*, 930 F.2d 267 (3d Cir.1991) (rejecting the reasoning of *Associates*, 729 F.Supp. at 1184–85).

insurance company, pursuant to an insurance policy, to avoid categorization as "plan assets" subject to ERISA.[9] First, the Plan's funds must be deposited in the insurance company's general account,[10] not in a separate account.[11] According to the *Mack* court, § 1101(b) "clearly makes a distinction between general account contracts and separate account contracts, limiting the guaranteed benefit policy exception, for the most part, to the former." 930 F.2d at 272 (footnote omitted). This interpretation of the requirements of the statute is supported by the regulations enacted pursuant to it, as described above. *See* § 2510.3–101(h).

 Second, *Mack* requires that a policy must provide guaranteed benefits to be entitled to the § 1101 exemption. However, *Mack* clarifies that the guarantee need only extend to the payments to be made to the plan beneficiaries at some finite point in the future. 930 F.2d at 273. It is enough that an insurance company's policy guarantees that it will pay annuities to qualifying plan participants. But "[p]ayments made to plan sponsors," in the form of interest payments to guaranteed funds on deposit with the insurance company, "can be varia-

ble without taking a ... contract out of the safe harbor created for guaranteed benefit policies." *Id.* at 273, 274 n. 16.

 In reaching this holding, *Mack* explicitly rejects the conclusion reached by other courts that variations in interest payments to funds held by an insurance company in conjunction with a guaranteed benefit policy suffice to impose fiduciary status on the insurer. *See Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320 (7th Cir.1983) (concluding that an insurer was a fiduciary with respect to assets it held in its general account because those assets were "plan assets"); *Jacobson v. John Hancock Mutual Life Insurance Co.*, 655 F.Supp. 1290, *vacated pursuant to settlement*, 662 F.Supp. 1103, 1112–13 (D.Conn.1987). Instead, *Mack* follows the approach of *Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Co.*, 722 F.Supp. 998 (S.D.N.Y.1989), concluding that "because the contract provided a fixed level of benefits to plan participants, namely an annuity upon retirement, it was a guaranteed benefit policy," and deeming "irrelevant the fact that certain payments due the plan sponsor were varia-

9. *Mack* further states that the guaranteed benefit policy exception of § 1101(b) "only applies to 'an insurance policy or contract,'" 930 F.2d at 272 (quoting 29 U.S.C. § 1101(b)), and that such contracts are "characterized by the underwriting and spreading of risks." *Id.* (quotation omitted). Therefore, in order to qualify for the § 1101(b) exemption, an insurance company must assume some risk in conjunction with its issuance of a policy to a Plan. That requirement is filled in this case. By agreeing to provide annuities to beneficiaries, Nationwide has assumed the risk of providing fixed payments regardless of how long the beneficiaries survive. *See SEC v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 71, 79 S.Ct. 618, 622, 3 L.Ed.2d 640 (1959) (an annuity contract is an insurance contract if it "involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts"). Further, as did the insurance company in *Mack*, Nationwide guaranteed that a specific minimum rate of interest would be credited to the unallocated fund, thereby assuming interest rate risk. 930 F.2d at 272.

10. An insurance company's general account "includes all the assets and liabilities of its insurance and ancillary operations, except those as-

sets and liabilities specifically allocated to separate accounts. From its general account, the insurance company pays operating expenses (i.e., salaries, rent, taxes), obligations to general account contractholders, obligations to creditors, and dividends to contract and policy holders. General account assets are often invested by the insurance company in private placement loans, corporate bonds, mortgages, real estate, and many other investment vehicles." *Mack*, 930 F.2d at 268. In a footnote, the Court further states that "[i]n most cases, the greatest number of general account contractholders are owners of life insurance policies. General account contracts are also typically used to provide pension, disability, and health insurance benefits." *Id.* at n. 2.

11. As defined by statute, "[t]he term 'separate account' means an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 29 U.S.C. § 1002(17).

ble."[12] *Mack*, 930 F.2d at 271 (*citing Harris Trust*). Thus, under *Mack*, where an insurance company has guaranteed annuity payments to beneficiaries, the fact that the return on the sponsor's funds on deposit are not guaranteed, but may vary reflecting the performance of the insurance company's general account, does not deprive the insurance company of the protection of 1101's exemption from ERISA's fiduciary obligations.

■ The contract at issue in the present suit qualifies under *Mack*'s two-part test. First, the funds on deposit with Nationwide were "co-mingled with Nationwide's other assets in its general account and, as such, are available to satisfy all of Nationwide's obligations to all of its contract holders and other creditors." Williams Aff. ¶ 5. The net investment rate with which the funds was credited approximates the investment performance of Nationwide's general account as a whole, rather than the return to a specific portfolio of assets allocated to Nationwide's account.[13] *Id.* at ¶ 12; *see* Laborer's No. 72–Summary, Plaintiff Exh. 10. Plaintiff asserts that the funds held by Nationwide were not deposited in its general account. Plaintiff Supp. Brief at 2. However, in the absence of any evidence contradicting the sworn testimony of Nationwide's Director of Compliance that the deposits were made to the general account, the court concludes that there is no genuine issue of material fact concerning the nature of the account in which plaintiff's contributions were deposited.[14]

Second, the Contract explicitly guaranteed payments to the beneficiaries. Whether in the form of guaranteed payments prior to termination or annuities purchased subsequent to it, the sums payable to beneficiaries under the Contract contained no variable element. That the funds on deposit with Nationwide were subject to variable rates of interest depending on the Net Investment Rate does not, under *Mack*, remove the Contract from the § 1101 exemption from ERISA coverage. Plaintiff objects, however, that, under the Contract, payments to plan beneficiaries were not guaranteed until termination or some other event triggered the purchasing of annuities. In accordance with the Contract, upon retirement of a plan participant, Nationwide provides the participant with an "Annuity Certificate," which "guarantees annuity benefits to that participant for the remainder of the participant's lifetime." Williams Aff. at ¶ 8. According to the sworn testimony of its Director of Compliance, Nationwide "recognizes that the Annuity Certificate constitutes a binding contract and imposes on Nationwide an obligation to make annuity certificate payments to the participant." *Id.* at ¶ 9. However, the Annuity Certificate is not an annuity; rather, payments are deducted from plaintiff's Guaranteed Fund as they become due. *Id.* at ¶ 10. Upon the occurrence of certain events, including termination of the Contract, the Annuity Certificates are replaced with annuities, purchased by Nationwide with monies from the Guaranteed Fund. Plaintiff Ex. 2, ¶ 6.3

12. Unlike the present case, the plaintiff and contract-holder in *Mack* was an employer sponsoring a pension plan. However, the plaintiff in *Harris* was a non-employer plan trustee, just as in the present case; and *Mack* cites *Harris* approvingly for the proposition that variable payments to funds deposited by a plan sponsor do not deprive the insurer of § 1101(b) immunity, without making any distinction as to the nature of the contract-holder. Accordingly, this court concludes that the *Mack* principles apply equally to employers sponsoring pension plans and to plan trustees, like the Trustees of Laborers' Local No. 72 Pension Fund.

13. This feature—crediting to a guaranteed account general account investment performance

in excess of the guaranteed rates—is distinctive of "Immediate Participation Guaranty Contracts," such as the Contract at issue herein. Williams Aff. at ¶ 4; *cf. Harris Trust*, 722 F.Supp. at 1000 (insurer was not liable as ERISA fiduciary with respect to funds deposited pursuant to immediate participation guaranty contract).

14. As plaintiff observes, it is not dispositive of this issue that the funds were not deposited to accounts defined as "Separate Accounts" under the Contract; however, this observation raises no inference of the contrary conclusion—i.e., that the funds were not deposited in Nationwide's general account.

Once the annuities are purchased, payments to beneficiaries are undisputedly guaranteed. A question about the extent of Nationwide's guarantee may arise, however, in the situation where the assets of the Guaranteed Fund are inadequate to cover Nationwide's obligations under the Annuity Certificates, or where an event triggering purchase of annuities occurs and sums in the Guaranteed Fund are insufficient to cover the full cost of annuities for all eligible plan participants, based on the contractual annuity purchase price. Under the Contract, the first situation will not occur: when funds in the Guaranteed Fund fall below 110% of the sum required to cover Nationwide's obligations to all eligible Plan beneficiaries, purchase of annuities is contractually required. Plaintiff Ex. 2, ¶¶ 1.16, 6.3(b). The second situation, however, could conceivably arise. In that case, the Contract provides that Nationwide will only cover the costs of annuities to the extent it is able to do so by drawing on monies in the Guaranteed Fund, in any Separate Account held by plaintiff, and from plaintiff's contributions. Plaintiff Ex. 2 at ¶ 6.3. If a shortfall still exists, Nationwide is not liable for providing full annuities to all eligible Plan participants.[15] *Id.*

Based on this provision, plaintiff argues that defendant's policy does not provide guaranteed benefits, and hence does not fall within the § 1101 exception as defined in *Mack.* The court does not agree. First, there is no question that an annuity, once purchased by Nationwide, is guaranteed; the level of benefits will not vary with investment performance, as does a variable annuity. Further, the Contract provides that annuities must be purchased when the

monies in the Guaranteed Fund, the principle of which is guaranteed, fall below 110% of the sum needed to fully fund all current pension liabilities, based on the annuity price contained in the Contract. Plaintiff Ex. 2, ¶¶ 1.15, 1.16, 6.3. Nationwide is contractually bound to provide annuities at this agreed-upon price. Accordingly, the only situation in which the cost of annuities for all eligible beneficiaries is not covered by the Guaranteed Fund would be where Plan participants retire, plaintiff does not supply funds adequate to cover the cost of an annuity for them at the contractually-established price, and previous contributions to the Guaranteed Account from plaintiff and from interest fail to make up the shortfall.

The court finds that this eventuality does not vitiate Nationwide's guarantee of benefit payments. Nationwide remains obligated to provide a certain gross level of payments; in effect, by underfunding new pensions, plaintiff would opt, under the terms of this Contract, to reduce the level of benefits to be provided to each individual. If plaintiff wishes to insure that full annuities are available to every eligible Plan participant, it need only fund them, at the level of the annuity purchase price guaranteed by Nationwide.[16] Nationwide has no control over the number of Plan participants who become eligible for pensions; and it is unreasonable in these circumstances to read the Contract or ERISA as requiring defendant to bear the risk of determining how many Plan beneficiaries will retire and require pensions, as distinct from the risk of providing annuities to those who are known to have retired.

---

**15.** This limitation on liability was repeated in the Annuity Certificates Nationwide provided to claimants, and may limit its liability under the Annuity Certificate contracts. The Certificates state: "In the event that an Annuity is to be purchased under the Group Annuity Contract, the amount of Annuity Payments is contingent upon payment by the Contractholder of the full consideration required therefor under said Contract." Plaintiff's Ex. 13.

**16.** The court observes that, because both principal and a minimum rate of interest are guaran-

teed, plan participant's annuities are not vulnerable to downturns in Nationwide's investment performance, except to the extent that hoped-for contributions from a net investment rate in excess of the guaranteed rate do not materialize. In the absence of these guarantees, plan participants might well be exposed to a level of risk too great to entitle Nationwide to an exception from fiduciary status. *See Peoria Union Stock Yards,* 698 F.2d at 322 (where no interest was guaranteed after first three years of group annuity contract, insurer was liable as ERISA fiduciary).

The court therefore concludes that the benefit payments to which Nationwide is contractually committed are "guaranteed" under the *Mack* standard. Accordingly, under *Mack*, Nationwide assumed no fiduciary duties toward the Plan's assets on deposit with it.

## EXEMPTION FROM FIDUCIARY STATUS FOR NON–DISCRETIONARY ACTS

■ Plaintiff further alleges that even if defendant fell within the § 1101 coverage exemption, it nonetheless became a fiduciary with respect to fund assets because it exercised discretionary authority in (1) purchasing annuities from itself; (2) unilaterally amending the Contract; and (3) paying a variable interest rate to the Guaranteed Fund. A person is only a fiduciary under ERISA, however, if they "exercise[ ] any discretionary authority or discretionary control" respecting management of the plan or its assets. 29 U.S.C. § 1002(21)(A). A "person who performs purely ministerial functions ... for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary." *Munoz v. Prudential Insurance Co.*, 633 F.Supp. 564, 567–68 (D.Colo.1986) (*quoting* 29 C.F.R. § 2509.75–8); *see also Associates*, 729 F.Supp. at 1180–81. Because Nationwide exercised no significant discretionary authority with respect to purchasing its own annuities, amending the Contract, or crediting the Net Investment Rate to the Guaranteed Fund, it cannot be deemed the Plan's fiduciary on any of these grounds.

■ First, Nationwide acquired no fiduciary duties merely by entering into a contract with plaintiff in which Nationwide agreed to appoint itself as the source of annuities to be issued under that Contract. Nationwide had no discretion in purchasing annuities from itself; this was precisely what plaintiff had bargained for and what the parties agreed to in the insurance Contract. If Nationwide were to become a fiduciary merely by selling annuities to plaintiff at a pre-determined price, then § 1101(b) would be as good as void; for,

under the same principle, the assets of any issuer of a guaranteed benefit policy would become plan assets, burdened with ERISA fiduciary obligations.

The cases cited by plaintiff in support of its argument that Nationwide's contract to provide such annuities represented self-dealing are inapposite. In *Arakelian v. National Western Life Insurance Co.*, 724 F.Supp. 1033 (D.D.C.1989), the insurance company was named in the plan documents as a fiduciary and trustee. In accordance with its contractual obligations, the *Arakelian* defendant had discretion to shop for annuity contracts other than those it offered. In the case at bar, in contrast, Nationwide contracted directly with trustees to sell the annuities to Plan participants, and agreed to a maximum price that it would receive for such annuities. The only discretion left to Nationwide was to charge less than the maximum set forth in the Contract. According to plaintiff, Nationwide never choose to do so; but the discretion to make this choice is not, in the view of this court, sufficient to subject Nationwide to fiduciary duties with respect to the purchase of annuities pursuant to the Contract.[17]

■ Second, the subsequent amendments or "endorsements" to the Contract did nothing to diminish the essentially ministerial nature of Nationwide's involvement with the pension fund assets. *See* Plaintiff Exs., 2–9. The endorsements, in which Nationwide set forth new purchase rates for annuities and guaranteed minimum interest rates for the pension funds on deposit in the Guaranteed Fund, proposed only prospective changes to existing rates. By proposing these rates, Nationwide agreed to bind itself for the period in which they remained in force. If plaintiff had been dissatisfied with any of these proposed changes, they had ample opportunity to withdraw from the Contract. Their failure to do so indicated their acquiescence in the proposed changes.

---

**17.** No evidence has been submitted to the court that Nationwide ever represented it would shop for the best price available when it came time to purchase annuities.

At least one court has held that the power to amend a policy may make an insurer a plan fiduciary. *See Chicago Board Options Exchange v. Connecticut General Life Insurance Co.*, 713 F.2d 254, 260 (7th Cir.1983) (where insurer's amendments to a policy held by a pension fund locked in contributors, thereby dictating plan investment decisions, insurer was fiduciary); *see also Harris Trust*, 722 F.Supp. at 1020, n. 29 (distinguishing cases where fiduciary duties were imposed on insurer on grounds that they involved contracts that gave the insurer the unilateral right to amend their terms to the detriment of the Plan trustee). However, in the case at bar, because Nationwide proposed amendments prospectively and afforded plaintiff the opportunity to negotiate or withdraw from the agreement, plaintiff effectively consented to the amended terms by failing to terminate the Contract. *Cf. Associates*, 729 F.Supp. at 1188–89 (insurance company was not fiduciary where excess interest rate was set out in advance of actual investment performance, obliging insurance company to pay that amount and affording dissatisfied participants the opportunity to withdraw); *Peoria Union Stock Yards*, 698 F.2d 320 (insurer was Plan fiduciary where it credited interest to deposited funds at rate announced in retrospect). The amendments therefore are not properly deemed discretionary acts of Nationwide, triggering fiduciary status. *See Robbins v. First American Bank of Virginia*, 514 F.Supp. 1183, 1191 (N.D.Ill.1981) (bank was not fiduciary because it could not amend loan participation agreement without participant's consent). In *Chicago Board Options Exchange*, the fund sponsor had been unable to withdraw its funds before the amendment went into affect, thus allowing the insurer to dictate the terms of the amended contract. 713 F.2d at 256. Nationwide was able to wield no such discretionary authority.

■ Third, the contractual provisions whereby the Guaranteed Fund could receive a variable interest rate when the Net Investment Rate exceeded the guaranteed rates, do not suffice to impose fiduciary responsibilities on Nationwide with respect to the rates paid. Contract, Art. II (Plaintiff Exh. 2). It is significant that this is not a case where the income to the guaranteed fund is entirely or primarily variable, based on a return to particular investments allocated to the fund. In *Peoria Union Stock Yards*, 698 F.2d at 322, the Seventh Circuit held that an insurer was a fiduciary where the guaranteed component of the interest credited to contributions declined over the first three years of the contract and interest credited in all periods after the third year was exclusively variable. In the present case, unlike, *Peoria Union Stock Yards*, the major component of the interest was prospectively guaranteed. The Net Investment Rate had only a marginal effect on the total return to the guaranteed fund, playing any role only in certain years. *See* Plaintiff Memo. at 15, 18; Plaintiff Exh. 10, Attachment 3.

More significantly, the variable component embodied in the Net Investment Rate reflects the general performance of Nationwide, not the performance of specific account assets. Therefore, Nationwide did not make discretionary investment decisions with respect to funds uniquely attributable to plaintiff. Under *Mack*, the Department of Labor's regulations, including 29 C.F.R. § 2509.75–2, and 29 U.S.C. § 1101(b) itself, crediting the Guaranteed Funds with such a variable component will not subject Nationwide to fiduciary duties—at least where, as here, the variable element represents a supplement to a guaranteed return on the funds invested. *See also Harris Trust*, 722 F.Supp. 998 (although pension funds invested with insurance company could receive more than guaranteed minimum if insurance company's investment performance exceeded the guarantee, insurer was not a fiduciary with respect to investing decisions).

## FIDUCIARY LIABILITY FOR CONTRACTUAL BREACHES

■ The court therefore concludes that Nationwide owed no fiduciary duties with respect to the purchase of the annuities, the setting of the Net Investment Rate, or the investment of plaintiff's assets. However, this conclusion does not absolve Na-

tionwide of all liability under ERISA for its conduct with regard to the policy. It is well established that an insurance contract issued to a plan is itself an asset of the plan, even if the assets invested with the insurance company are not. As ERISA states, "[i]n the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy." 29 U.S.C. § 1101(b). *See also Chicago Board Options Exchange,* 713 F.2d at 260 ("policy itself is a Plan asset"). Hence, as the Third Circuit concluded in *Mack,* "if [an insurer] breached any provision in the contract, [the Plan sponsor] would not only have an action for breach of contract, but would also have an action for breach of ERISA fiduciary duties." 930 F.2d at 277 n. 20.

Plaintiff charges Nationwide with several violations of the terms of the Contract, including (1) failing to include a fixed termination date; (2) averaging guaranteed rates to reduce the benefit from the Net Investment Rate; and (3) debiting expenses from high yielding accounts. If these charges state a claim for breach of contract, they also, pursuant to *Mack,* state a claim for violation of ERISA fiduciary duties.

■ This court rejects plaintiff's argument that the failure to include a fixed termination date in the Contract is either unconscionable or itself a violation of ERISA. The Contract contains termination procedures which, although they do not provide a fixed termination date, set forth the circumstances in which termination will occur or how it may be accomplished at a party's election.[18] These contractual terms were the result of negotiation between parties of equal sophistication and the procedures they prescribe are not so burdensome as to support plaintiff's claim of unconscionability. Under these circumstances, the absence of a fixed date is unobjectionable.

■ Plaintiff's latter two claims, however, may present triable issues of fact. With regard to crediting the Net Investment Rate, plaintiff charges that defendant averaged the guaranteed rates, thereby reducing the spread between guaranteed and Net Investment Rates and decreasing the amount Nationwide was obliged to pay to the Guaranteed Fund. In support of its view, plaintiff submits fund statements which apparently show that, in a year when the Net Investment Rate was 13.77%, a fund with a guaranteed rate of 8.25%, which allegedly should have received $50,000 in additional interest, was credited with no additional interest, while a fund with a guaranteed rate of 15.5% received $4,121 in additional interest. Plaintiff Brief at 37, Plaintiff Ex. A–F.

Defendant responds that it did not average Guaranteed Rates in computing the spread between the Guaranteed and Net Investment Rate, but compared "on a contract basis ... the amount actually earned on a contract basis and the amount actually credited on a contract basis." Spilker Dep. at 42 (Pendleton Aff., Ex. E); *see also* Def. Reply Mem. at 9. Defendant explains the fact that additional interest was credited only to an account for which the Guaranteed Rate exceeded the Net Investment Rate, on the grounds that additional interest was routinely credited to the fund accepting new deposits at that time. Williams Dep. at 89 (Pendleton Aff., Ex. F).

Plaintiff's final claim is that defendant selectively debited expense and payment costs from the highest yielding accounts. Thus, in 1982, Nationwide allegedly debited all contract expenses and benefit payments from an account earning 15.5%—the highest yielding of all the guaranteed fund accounts. Plaintiff Brief at 38–39. Defendant responds that it did not exercise any discretion by choosing to debit high-yielding accounts for various expenses, but merely acted in accordance with LIFO (last in, first out) accounting practices. Def.

---

**18.** The Contract states that it "shall terminate on the date coinciding with the latest to occur of the date when (a) the Guaranteed Fund is exhausted by withdrawals therefrom, (b) each Variable Fund is exhausted by cancellation of Units, and (c) no further annuity payments are payable hereunder." Contract, Art. VIII (Plaintiff Exh. 2).

Reply Mem. at 9; Williams Dep. at 97–98 (Pendleton Aff. Ex. F).

The court concludes that it is premature to grant summary judgment on these two issues based on the submissions presently before it; however, the court is also not yet convinced that there are disputed issues of material fact entitling this matter to proceed to trial. Accordingly, the court will require further submissions from the parties, to be filed within three weeks from the date of entry of the order accompanying this opinion, specifically addressing the following questions:

(1) Did Nationwide fully credit each guaranteed account with the spread between that account's guaranteed rate and the applicable Net Investment Rate?

(2)(a) Did Nationwide debit expenses and benefit payments from guaranteed accounts in accordance with LIFO accounting practices?

(2)(b) Assuming that accounts were debited in accordance with LIFO, would such a procedure breach the Contract?

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted with respect to claims based on alleged breaches of fiduciary duty in connection with the management or disposition of the Guaranteed Fund assets and the establishment of Net Investment Rates. Defendant's motion for summary judgment is further granted on plaintiff's claim that failure to include an express termination date is unconscionable or a violation of ERISA. Finally, both plaintiff's and defendant's motions are denied with respect to all other claims based on alleged violations of the Contract and the parties are directed to make further submissions to this court, as specified in the foregoing opinion.